STATE OF NEBRASKA, APPELLEE, V.
RICKEY L. JIM, APPELLANT.

688 N.W.2d 895

Filed November 23, 2004.    No. A-03-033.

This opinion has been ordered permanently published by order of the Court of Appeals dated November 4, 2004.

Jeff T. Courtney and William J. Pfeffer, of Pfeffer & Courtney, for appellant.

Jon Bruning, Attorney General, and James H. Spears for appellee.

IRWIN, Chief Judge, and SIEVERS and INBODY, Judges.

INBODY, Judge.

## I. INTRODUCTION

Rickey L. Jim appeals his conviction of child abuse resulting in death, in violation of Neb. Rev. Stat. § 28-707(1)(a) and (b) (Cum. Supp. 2002), and the sentence of 40 to 50 years' imprisonment imposed thereon. For the reasons set forth herein, we affirm his conviction and sentence.

## II. STATEMENT OF FACTS

On September 21, 2001, Jim was charged by amended information with child abuse resulting in death. The amended information alleged that Jim knowingly or intentionally caused or permitted a minor child, Layne Bryan Banik, to be placed in a situation that endangered his life or health or to be cruelly confined or punished resulting in the death of said child. Jim was also charged with second degree murder, but this charge was later dismissed on the State's motion.

On March 15, 2002, Jim filed a motion to suppress statements he made to police. Following a hearing, this motion was denied by the district court.

A jury trial was held on October 21 through 25, 2002. Candice Bryan testified that she is a 23-year-old mother of two children: a daughter, Sara Bryan Banik, who was born on June 28, 1996, and the victim, Layne, who was born on June 29, 1998. In June 2000, Bryan met Jim through Jim's sister, and Bryan and Jim immediately began dating. On November 3, Bryan, her two children, and Jim moved into an apartment together.

Bryan was employed full time at West Hills Service as a support specialist since August 1997. In early 2001, Bryan's work hours at West Hills Service were changed, requiring her to work from 4 or 5 p.m. until approximately 11 p.m. or 1 a.m. Bryan asked Jim to watch 4½-year-old Sara and 2½-year-old Layne, since Jim was unemployed at that time, and Jim agreed. According to Bryan, although Jim watched the children the majority of the time, if he and Bryan had an argument, Jim would tell her, " 'Find your own babysitter or find somebody else to watch the kids.' " At those times, either Bryan would have her parents watch the children or she would stay home from work.

On May 7, 2001, in the late afternoon, Bryan and Layne were lying on the bed in Bryan and Jim's bedroom, watching cartoons, and Layne had fallen asleep in her arms. Bryan had to get up to get ready for work, which started at 5 or 6 p.m., so she let Layne sleep on her bed while she was getting ready. At that time, Layne did not exhibit any signs of illness and he did not have any injuries except for a small scratch underneath his nose.

Bryan intended to let Layne sleep, but as she was leaving for work, Jim became angry when he found out that Layne was sleeping in his and Bryan's bed. According to Bryan, Jim told her, " 'Put [Layne] in his own bed, he doesn't need to be sleeping in my bed.' " Bryan went to wake Layne up and found him awake, watching cartoons. When she told him that he had to sleep in his own bed, Layne started to cry. Bryan picked Layne up, carried him to his room, put him in his bed, and gave him a kiss goodbye. Bryan then left for work, but had to return 10 to 15 minutes later because she had forgotten a birthday present for a coworker. When she returned to the apartment, Layne and Sara were in their respective bedrooms, playing. When Bryan left the apartment the second time, Jim was sitting on the living room couch and watching television.

Later that evening, between 8 and 10 o'clock, Bryan called the apartment and talked to Jim. She did not talk to either Sara or Layne, because Jim told her that the children were eating. When Bryan arrived home from work at approximately 11 p.m., Jim was in the living room playing a video game. Bryan did not check on Sara and Layne, because the door to each of their bedrooms was closed and because sometimes the bedroom doors would creak, causing the children to wake up, which made Jim angry. Bryan did laundry for approximately 1 hour, folding laundry on the floor in the living room while Jim continued playing a video game. Bryan did not notice anything unusual about Jim's behavior, and she went to bed at approximately 1 a.m.

The following morning when Bryan woke up, Jim told her that Sara was awake and eating breakfast and that Layne was still asleep. Jim then left the apartment to apply for a job. At some point after Jim left, Sara asked Bryan if Sara could play with Layne, so Bryan went into Layne's bedroom to wake him up. As Bryan opened Layne's bedroom door, she saw that he was lying face down on his bed, with his face completely in his pillow. At that point, Bryan knew that something was wrong. She called Layne's name and rolled him over. Layne's face was blue, and he was stiff. After attempting to perform mouth-to-mouth resuscitation on Layne, Bryan called the 911 emergency dispatch service. After being told by the 911 operator to place Layne on a flat surface, Bryan moved him to the floor, placing him on his back, and she again attempted to resuscitate Layne.

Bryan testified that she was interviewed by police on both May 8 and 9, 2001. During cross-examination, defense counsel questioned Bryan regarding the interviews. Defense counsel asked Bryan, "Did [the police] tell you that it was an accident, they thought it was an accident?" The State objected on hearsay grounds. Although defense counsel argued that the testimony was offered to establish the interrogation process and was not offered for the truth of the matter asserted, the district court sustained the State's objection. Defense counsel then also made the following argument to the court that the court's ruling violated Jim's constitutional right to confront his accuser, pursuant to the Confrontation Clause:

I just want to make clear on the record that if I were allowed to continue I would ask specifics about that which the police inquired of this witness [Bryan] concerning what they told her about the death, what they told her, whether true or not, because it's not offered for the truth of the matter. It's to demonstrate the approach taken and what responses she gave and why she gave the responses and to demonstrate through the pressure that was placed upon her the credibility of the answers she gave at that time. . . .

. . . .

[I]f [the police] said, "We know you killed your son," I'm not offering it to prove that [Bryan] killed her son. I'm offering it to prove that the police said it. That doesn't make it true. Hearsay is an out-of-court statement offered to prove the assertion therein, the truth of the matter asserted. . . . [I]f [the police] say, "We know you killed your kid," I'm not trying to prove that she killed her kid by that statement; I'm trying to prove what the interrogation process was. And that's why it's not hearsay.

On cross-examination, Bryan did testify that during the interview at the police station, the police used "different approaches to try to get [her] to say what they wanted [her] to say," including treating her as if she murdered Layne, then being nice to her. She also testified the officers pressured her to admit that she had harmed Layne or that Jim had harmed Layne. Bryan testified that she responded to the pressure by becoming "hysterical."

Bryan testified that Layne was not potty-trained and that Jim would get very angry with Layne if he wet his diaper. Bryan testified that she had concerns about Jim's potty-training Layne, because Jim would yell at Layne, pull Layne down the hallway, and set Layne down hard on the toilet. Bryan further testified that one time, she observed that Layne had fallen asleep sitting on the toilet and that she did not know how long he had been sitting there.

With regard to the children's bedtime, Bryan testified that Jim would walk the children to their rooms and that if Layne was not walking fast enough, Jim would push Layne on his back or the back of the head to make him go faster. At bedtime, if the children started to cry, wanted a drink, or had to go to the bathroom, Jim would get angry with them and tell them to go to bed. Jim would

not allow the children to get out of their beds after they went to bed. According to Bryan, the children initially liked Jim, but they began showing signs of being afraid of Jim when she and Jim began living together and Jim began watching the children.

Omaha Police Det. Mark Griffey testified that on May 8, 2001, at approximately 11:55 a.m., he arrived at Bryan and Jim's residence. Present at the residence were Bryan, Jim, and other extended family members. Bryan and Jim were asked to submit to police interviews, and both agreed. Griffey transported Bryan in his vehicle to Project Harmony, where victim and witness interviews are conducted. Griffey testified that Jim also needed to be interviewed; Jim was given an option of either transporting himself to Project Harmony or riding with Griffey and Bryan, and Jim opted to ride with Griffey and Bryan.

Upon arriving at Project Harmony, Bryan and Jim were separated. Griffey interviewed Bryan first, which interview lasted from 12:51 to 1:35 p.m. Griffey then interviewed Jim in a conference room from 1:41 to 2:30 p.m. This interview was audiotaped and was admitted into evidence as exhibit 1. During these interviews, Bryan and Jim were not advised of their *Miranda* rights, and after the interviews, both were allowed to leave.

On the following morning, May 9, 2001, an autopsy was performed on Layne. After learning of the autopsy results, Griffey and a Detective Bang contacted Bryan at her parents' home at approximately 1 p.m. because the detectives wanted to discuss the autopsy results with Bryan and interview her again. Because Bryan was waiting for her pastor to discuss funeral arrangements, it was agreed that Bryan would meet the detectives at the police station later that day. Although a reinterview with only Bryan had been requested, Bryan's parents and Jim accompanied her to the police station, arriving at 3:45 p.m. The detectives interviewed Bryan from 4:05 until 6:30 p.m. During the detectives' interview of Bryan, Bryan's parents and Jim waited in a waiting room.

After interviewing Bryan, Griffey asked Jim whether he would be willing to be interviewed again, and Jim agreed. Griffey escorted Jim to an interview room and advised Jim of his *Miranda* rights, which Jim waived. Griffey and Bang then interviewed Jim for approximately 3½ hours, concluding at approximately 10 p.m.

During this interview, Jim admitted taking methamphetamines on May 7, 2001, at approximately 4:30 p.m. Further, he admitted that from the time that Bryan left for work at 4:35 p.m. until she got home from work at 11:30 p.m., he was the only person with access to Layne and Sara. Following this interview, Jim was allowed to leave.

The May 9, 2001, interview of Jim was both audiotaped and videotaped. The videotapes were redacted by agreement of the parties, and the redacted videotapes were admitted into evidence as exhibits 19 and 20. Additionally, a portion of exhibit 21, an audiotape of the May 9 interview, was played, which audiotape contains the portion of the interview that occurred when the videotapes had to be changed and that thus was not captured on videotape.

Following the publishing of the tapes to the jury, defense counsel moved for a mistrial due to the following statement by Jim during the interview: "Well now that you guys tell me his arm is broke, it's something you know, maybe I did pull his arm too hard or you know, I've, if, if something like that happened, I didn't mean for it to happen you know." The court stated, "I am not inclined to grant the mistrial but I would really be receptive to some sort of instruction if you could do it without calling attention to what you don't want to call attention to."

At defense counsel's request, the court read the following admonition to the jury:

Ladies and gentlemen of the jury, the Court gives the following admonition concerning audio- and videotaped statements made by [Jim] to police officers.

During the course of the interrogation you heard statements made by the police officers to [Jim], including statements attributed to third parties. These statements are not offered for the truth of the matter contained in those statements and shall not be considered by you for that purpose. They're admitted solely to demonstrate the method of interrogation of [Jim] and to put his statements in context.

Defense counsel did not request that any additional admonitions be given to the jury.

The State's expert witness was Dr. Jerry Wilson Jones, a forensic pathologist who performs autopsies for Douglas County,

Nebraska, as well as approximately 40 to 45 other counties in Nebraska and several counties in western Iowa. Dr. Jones testified that he performed Layne's autopsy on May 9, 2001, at 10 a.m.

During the first part of the autopsy, which is the external examination of the body, Dr. Jones observed blunt force injuries in the form of abrasions and contusions (bruises) that involved the lower part of Layne's nose, the upper and lower lips, the gums, both sides of the neck, the back of the scalp, and the back of the left shoulder. During the internal examination of Layne's body, Dr. Jones found that (1) on examination of Layne's internal scalp tissue, there were two separate areas of hemorrhage in the back of the scalp, indicative of blunt force trauma, and (2) there was a hemorrhage present in the soft tissue of the left side of the neck alongside the larynx, trachea, and the thyroid gland, also indicating a fresh area of injury from blunt force trauma to the left side of Layne's neck. Dr. Jones testified that blunt force trauma could be caused by pressure applied to that area.

Further, Dr. Jones testified that in the examination of Layne's body cavity organs, there were focal areas of small pinpoint hemorrhages present on the lining of Layne's heart and the lining of both lungs, which hemorrhages are often seen in deaths caused by asphyxiation. During Dr. Jones' testimony, he explained that exhibit 14 was a photograph of one of Layne's hemorrhaged lungs. According to Dr. Jones, hemorrhages were present in both of Layne's lungs and the injuries were fresh.

Dr. Jones testified that based upon his experience and training and his post mortem examination of Layne's body, his opinion to a reasonable degree of medical certainty regarding the cause of death was "asphyxiation secondary to smothering." Dr. Jones defined smothering as "meaning specifically to cover the nose and mouth in some fashion such that no oxygen gets into the lungs by way of the nose or mouth." He further explained that suffocation is a broad term for asphyxiation and that there are different forms of suffocation, one of which is smothering.

Additionally, over defense objection, Dr. Jones testified that based upon his experience, education, and observations during Layne's autopsy, and based upon a reasonable degree of medical certainty, the smothering of Layne was an intentional act and was not accidental. He further stated, "There is no way that [Layne]

could have smothered himself, so that the smothering has to be an intentional act."

Dr. Jones further testified that in his opinion based on a reasonable degree of medical certainty, the abrasions to Layne's nose, lips, and gums were caused by Layne's face and neck being forced into a pillow or bedding until he died and that the injuries were consistent with those produced by a struggling child who is having his face and mouth covered by being pushed into a pillow or bedding. With regard to the two contusions in the back of Layne's head, Dr. Jones testified that his opinion to a reasonable degree of medical certainty was that those injuries were consistent with pressure applied to the back of Layne's head in order to push his face into the pillow or bedding. Further, he opined that based upon a reasonable degree of medical certainty, the hemorrhaging to Layne's neck in the area of the larynx, trachea, thyroid gland, and thymus was consistent with control of the head and neck from the back and with pressure applied both to the right side of the neck, producing the abrasion, and to the left side of the neck, producing the hemorrhage.

Dr. Jones further testified to a reasonable degree of medical certainty that there is a correlation between the appearance of livor mortis and the time of death. Dr. Jones testified that livor mortis

> is a change that occurs after death. When a person dies the blood is still fluid, and it will drain by gravity to whatever part of the body is, dependent, and there it will clot and impart a purplish appearance to the skin in that area. . . .
>
> [So] if the person dies face down, then the blood will drain from the back to the front of the body and clot in the blood vessels of the front of the body and imparting a purplish appearance to the skin of the front of the body.
>
> . . . [A]fter a period of time the blood is no longer fluid and it will clot so that the livor mortis will not shift. So the person who dies on [his or her] back will have livor mortis on the back but not on the front; a person who dies . . . face down on the front of the body will have livor mortis on the front of the body and not on the back of the body.

According to Dr. Jones, in general terms, it takes approximately 4 to 8 hours for livor mortis to become fixed such that it would not shift if the body is turned in the opposite position. Dr. Jones

observed that livor mortis was present on the front of Layne's body, indicating that Layne died face down and was dead in the face-down position for a period of many hours.

At the close of the State's case, the defense moved for a directed verdict, which was denied. The defense presented testimony from one witness, Dr. Carlos Prendes, who testified that there is a phenomenon called sudden unexplained death in children, which phenomenon is similar to sudden infant death syndrome, except that it is an unexplained death occurring in children from 1 to 11 years old. However, Dr. Prendes was not asked to examine the autopsy in the instant case or to examine the facts surrounding Layne's death. Dr. Prendes further admitted that a diagnosis of unexplained death in children is a diagnosis of exclusion in which the cause of death is unknown.

On October 25, 2002, the jury found Jim guilty of child abuse resulting in death. On December 18, Jim was sentenced to 40 to 50 years' imprisonment, with credit for 474 days served. Jim has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

On appeal, Jim assigns the following errors: (1) The trial court erred in overruling his motion to suppress statements, (2) the court erred in overruling his motion to dismiss or for directed verdict, (3) the court erred in admitting or excluding certain evidence, and (4) the court erred in imposing an excessive sentence.

### IV. STANDARD OF REVIEW

■ A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, will be upheld unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Mata*, 266 Neb. 668, 668 N.W.2d 448 (2003); *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001).

■ Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue

is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Segura*, 265 Neb. 903, 660 N.W.2d 512 (2003); *State v. Vaught*, 12 Neb. App. 306, 672 N.W.2d 262 (2003).

## V. ANALYSIS

### 1. DENIAL OF MOTION TO SUPPRESS STATEMENTS

First, Jim contends that the trial court erred in overruling his motion to suppress statements made during the May 8 and 9, 2001, interviews with police. Specifically, he contends that the May 8 interview should have been suppressed because Jim had not been advised of his *Miranda* rights prior to the interview. He further contends that the May 9 interview should have been suppressed because, although Jim was advised of his *Miranda* rights prior to this interview, he claims that he did not understand that he had a right to counsel during the interview.

In *State v. Mata*, 266 Neb. at 681, 668 N.W.2d at 465, the Supreme Court stated:

> *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000).

### (a) May 8, 2001, Interview

Jim contends that his statements to police made during the May 8, 2001, interview should have been suppressed because Jim had not been advised of his *Miranda* rights prior to the interview.

It is clear that Jim was subjected to an interrogation during the May 8 interview. Therefore, the question becomes whether he was in custody for the purposes of *Miranda*.

In *State v. Mata*, 266 Neb. 668, 681, 668 N.W.2d 448, 465 (2003), the Supreme Court stated:

> *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." *State v. Brouillette*, 265 Neb. 214, 655 N.W.2d 876 (2003). One is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *Brouillette, supra*. Two inquiries are essential to the determination whether an individual is in custody for *Miranda* purposes: (1) an assessment of the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. [*State v.*] *Dallmann*[, 260 Neb. 937, 621 N.W.2d 86 (2000)].

In the instant case, Jim was asked to submit to an interview and he agreed. Further, he was given the option of either transporting himself to Project Harmony for the interview or riding with Griffey and Bryan. Jim opted to ride with Griffey and Bryan, and at the conclusion of the interview, Jim was allowed to leave. Thus, Jim's freedom of movement was not restrained to the degree associated with an arrest, and a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave. Consequently, we reject Jim's claim that the May 8, 2001, interview should have been suppressed.

### (b) May 9, 2001, Interview

Next, Jim contends that the May 9, 2001, interview should have been suppressed because, although Jim was advised of his *Miranda* rights prior to this interview, he claims that he did not understand that he had a right to counsel during the interview. There is no evidence in the record to suggest that Jim did not comprehend or understand his *Miranda* rights, which he waived. He stated that he understood his rights and did not ask any questions or request clarification of his rights.

Quite simply, there is nothing in the record to support Jim's recent claim that he did not understand his right to counsel.

It is incumbent upon the appellant to present a record to support the errors assigned. *State v. Taylor*, 262 Neb. 639, 634 N.W.2d 744 (2001). Consequently, we find that this assignment of error is without merit.

## 2. DENIAL OF MOTION TO DISMISS OR MOTION FOR DIRECTED VERDICT

Second, Jim assigns as error that the trial court erred in overruling his motion to dismiss or for directed verdict, because he claims that even when the evidence is construed in the light most favorable to the State, the State failed to establish a prima facie case.

Whether a trial court should have granted a motion for directed verdict and a motion to dismiss at the close of the State's case in chief and at the close of all the evidence is a question of law. See *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996). When reviewing questions of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Arnold*, 253 Neb. 789, 572 N.W.2d 74 (1998).

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Sims*, 258 Neb. 357, 603 N.W.2d 431 (1999).

The information charged Jim with child abuse resulting in death by knowingly, intentionally, or negligently causing or permitting a minor child to be placed in a situation that endangered his life or physical or mental health or to be cruelly confined or cruelly punished.

The evidence was that on May 7, 2001, Layne was alive when Bryan left for work and that Layne was left in Jim's care. Jim was alone with Layne from approximately 5 until 11 p.m. Bryan did not check on Layne until the next morning, when she found Layne dead in his bed.

Dr. Jones testified that Layne died of asphyxiation secondary to smothering and that it was Dr. Jones' opinion that the suffocation of Layne was done intentionally: "There was no way that [Layne] could have smothered himself, so that the smothering has to be an intentional act." Dr. Jones further testified that he believed that Layne's face and neck were forced into the pillow or the bedding until he suffocated and died. This evidence is sufficient to support Jim's conviction of child abuse resulting in death. Consequently, this assignment of error is without merit.

### 3. ADMISSION AND EXCLUSION OF EVIDENCE

Third, Jim claims that the trial court erred in admitting or excluding certain evidence.

██ It is within the trial court's discretion to admit or exclude evidence, and such rulings will be upheld on appeal absent an abuse of discretion. *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989); *State v. Owens*, 8 Neb. App. 109, 589 N.W.2d 867 (1999), *reversed on other grounds* 257 Neb. 832, 601 N.W.2d 231.

### (a) Exclusion of Evidence During Cross-Examination of Bryan

Jim argues that the district court erred in sustaining the State's hearsay objection when defense counsel attempted, during cross-examination, to question Bryan as to what the officers asked or told her during their interrogations of her. Defense counsel also argued to the court, and raises in Jim's appellate brief, that the court's ruling violated Jim's constitutional right to confront his accuser, pursuant to the Confrontation Clause.

Defense counsel asked Bryan, "Did [the police] tell you that it was an accident, they thought it was an accident?" The State objected on hearsay grounds. Although defense counsel argued that the testimony was offered to establish the interrogation process and was not offered for the truth of the matter asserted, the district court sustained the State's objection. Defense counsel then also made the following argument to the court that the court's ruling violated Jim's constitutional right to confront his accuser, pursuant to the Confrontation Clause:

> I just want to make clear on the record that if I were allowed to continue I would ask specifics about that which the police

inquired of this witness [Bryan] concerning what they told her about the death, what they told her, whether true or not, because it's not offered for the truth of the matter. It's to demonstrate the approach taken and what responses she gave and why she gave the responses and to demonstrate through the pressure that was placed upon her the credibility of the answers she gave at that time. . . .

. . . .

[I]f [the police] said, "We know you killed your son," I'm not offering it to prove that [Bryan] killed her son. I'm offering it to prove that the police said it. That doesn't make it true. Hearsay is an out-of-court statement offered to prove the assertion therein, the truth of the matter asserted. . . . [I]f [the police] say, "We know you killed your kid," I'm not trying to prove that she killed her kid by that statement; I'm trying to prove what the interrogation process was. And that's why it's not hearsay.

Assuming without deciding that the district court erred in sustaining the State's hearsay objection, we find that such error did not affect a substantial right of Jim, because defense counsel was able to adequately explore the interrogation process through cross-examination of Griffey and Bang regarding the interrogation techniques used to interview Bryan. "Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ." Neb. Rev. Stat. § 27-103(1) (Reissue 1995). Further, Neb. Rev. Stat. § 29-2308 (Reissue 1995) provides in part:

No judgment shall be set aside, new trial granted, or judgment rendered in any criminal case on the grounds of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure if the appellate court, after an examination of the entire cause, considers that no substantial miscarriage of justice has actually occurred.

In sum, after having reviewed the record in the instant case, we find it is clear that no substantial miscarriage of justice has occurred with the district court's denial of defense counsel's line of questioning of Bryan regarding the questions and statements made by the officers to Bryan during their interrogations of her.

Additionally, Jim claims that the trial court's limitation of his right to cross-examine Bryan constituted a violation of his constitutional right to confrontation. In support of this claim, Jim cites *State v. Dyer*, 245 Neb. 385, 398-99, 513 N.W.2d 316, 325-26 (1994), in which the Nebraska Supreme Court stated:

> "The right to cross-examine a prosecution witness regarding bias or motive is an important interest. 'A more particular attack on the witness' credibility is effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is "always relevant as discrediting the witness and affecting the weight of his testimony." . . .' . . . Thus, the denial of a criminal defendant's right to confront her or his accusers, and implicitly the right to cross-examination . . . is a violation of the defendant's constitutional rights."

However, the line of questioning with which Jim sought to cross-examine Bryan did not tend to establish any bias, prejudice, partiality, or ulterior motive on her part. If it was defense counsel's strategy to explore police tactics, he had the opportunity to do so, and in fact did so, through his cross-examination of the police officers who conducted the interrogations. Griffey and Bang were thoroughly cross-examined as to the interrogation techniques used in interviewing both Jim and Bryan. Thus, we reject Jim's argument that his constitutional right to confrontation was violated by the district court's refusal to allow him to cross-examine Bryan regarding the questions and statements made by the police to her during their interrogations of her.

### (b) Admission of Exhibit 14

Jim also argues that the district court erred in admitting exhibit 14, a photograph of one of Layne's hemorrhaged lungs. Jim claims that the photograph should have been excluded because its probative value was outweighed by the danger of unfair prejudice.

The admission of photographs of a gruesome nature rests largely in the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. *State v. Decker*, 261 Neb. 382, 622 N.W.2d 903

(2001). If a photograph illustrates or makes clear some controverted issue in a homicide case, a proper foundation having been laid, it may be received, even if gruesome. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). Likewise, in a homicide prosecution, photographs of a victim may be received into evidence for purposes of identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent. *State v. Clark*, 255 Neb. 1006, 588 N.W.2d 184 (1999).

The photograph at issue was relevant and not unduly prejudicial, because it demonstrated what Dr. Jones believed to be Layne's cause of death, asphyxiation, and that Layne's death was caused by an intentional act. Both of these issues were controverted at trial. Consequently, the probative value of exhibit 14 was not outweighed by the danger of unfair prejudice and the exhibit was properly admitted into evidence.

(c) Admission of Expert Testimony

Next, Jim claims that the district court erred in admitting expert testimony by Dr. Jones over defense counsel's objection. The following colloquy took place during the trial while Dr. Jones was testifying on behalf of the State:

[Prosecutor:] All right. And based on your experience and your educational background as well as your observations of the child on autopsy, do you have an opinion to a reasonable degree of medical certainty whether or not this was an intentional or accidental smothering of the child?

[Defense counsel]: I'm going to object, no foundation. That's beyond his expertise, your Honor.

THE COURT: Overruled; he may answer.

[Dr. Jones]: Yes, in my opinion, I mean, this is certainly not accidental. There is no way that this child could have smothered himself, so that the smothering has to be an intentional act.

The admissibility of evidence is reviewed for an abuse of discretion, where the Nebraska rules of evidence commit the evidentiary question at issue to the discretion of the trial court. *State v. Canbaz*, 259 Neb. 583, 611 N.W.2d 395 (2000); *State v. Sanchez*, 257 Neb. 291, 597 N.W.2d 361 (1999); *State v. Chojolan*,

253 Neb. 591, 571 N.W.2d 621 (1997). When judicial discretion is not a factor involved in assessing admissibility, the court's application of the Nebraska rules of evidence will be upheld unless clearly erroneous. *State v. Canbaz, supra*; *State v. Jacob*, 242 Neb. 176, 494 N.W.2d 109 (1993). The decision whether to exclude expert witness testimony in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Canbaz, supra*; *State v. Larsen*, 255 Neb. 532, 586 N.W.2d 641 (1998).

In the instant case, Dr. Jones testified extensively regarding his training, education, and experience in pathology, and there is no question that he is certainly qualified as an expert witness. Further, there was sufficient foundation for Dr. Jones to express his opinion that Layne's death was intentional, not accidental. Finally, Dr. Jones testified as to his opinion how Layne's death occurred; Dr. Jones did not express his opinion as to whether Jim was responsible for Layne's death. Consequently, Dr. Jones' testimony did not usurp the jury's role in determining Jim's guilt in causing Layne's death. Therefore, this assigned error is without merit.

### (d) Denial of Motion for Mistrial

Jim also contends that the district court erred in overruling his motion for a mistrial when a statement relating to an issue which was ordered to be excluded from trial was inadvertently played during a videotape shown to the jury. Prior to the start of trial, it was agreed by the State and the defense that evidence relating to long bone fractures would be excluded from trial, and the audiotapes and videotapes were redacted to remove references thereto. However, the following statement by Jim, in an approximately 3½-hour interview, was inadvertently left in the tapes: "Well now that you guys tell me his arm is broke, it's something you know, maybe I did pull his arm too hard or you know, I've, if, if something like that happened, I didn't mean for it to happen you know."

The decision whether to grant a motion for mistrial is within the discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of discretion. *State v. Cook*, 266 Neb. 465, 667 N.W.2d 201 (2003). A mistrial is properly granted in a criminal case where an event occurs during the course of a

trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Shipps*, 265 Neb. 342, 656 N.W.2d 622 (2003).

In the instant case, at defense counsel's request, the court read the following admonition to the jury:

> Ladies and gentlemen of the jury, the Court gives the following admonition concerning audio- and videotaped statements made by the defendant to police officers.
>
> During the course of the interrogation you heard statements made by the police officers to the defendant, including statements attributed to third parties. These statements are not offered for the truth of the matter contained in those statements and shall not be considered by you for that purpose. They're admitted solely to demonstrate the method of interrogation of the defendant and to put his statements in context.

Defense counsel did not request that any additional admonitions be given to the jury.

Although the objectionable testimony should have been redacted along with the other portions of Jim's interview with police relating to long bone fractures, the damaging effect of the statement was removed by the court's instruction to the jury and no substantial miscarriage of justice actually occurred in this case, nor was a fair trial prevented.

> No judgment shall be set aside, new trial granted, or judgment rendered in any criminal case on the grounds of misdirection of the jury or the improper admission or rejection of evidence or for error as to any matter of pleading or procedure if the appellate court, after an examination of the entire cause, considers that no substantial miscarriage of justice has actually occurred.

§ 29-2308. Consequently, the decision of the district court to deny Jim's motion for a mistrial did not constitute an abuse of discretion and this assignment of error is without merit.

### 4. Excessive Sentence

Finally, Jim contends that the sentence imposed was excessive and constituted an abuse of discretion.

    ■ In imposing a sentence, a sentencing judge should consider the defendant's age, mentality, education, experience, and social and cultural background, as well as his or her past criminal record or law-abiding conduct, motivation for the offense, nature of the offense, and the amount of violence involved in the commission of the crime. *State v. Timmens*, 263 Neb. 622, 641 N.W.2d 383 (2002); *State v. Rodriguez*, 11 Neb. App. 819, 660 N.W.2d 901 (2003).

    ■ Where a sentence imposed within statutory limits is alleged on appeal to be excessive, the appellate court must determine whether the sentencing court abused its discretion in considering and applying these factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Roeder*, 262 Neb. 951, 636 N.W.2d 870 (2001); *State v. Rodriguez, supra.* An abuse of discretion takes place when the sentencing court's reasons or rulings are clearly untenable and unfairly deprive a litigant of a substantial right and a just result. *Id.*

In the instant case, Jim was convicted of child abuse resulting in death, a Class IB felony punishable by a minimum of 20 years' imprisonment and a maximum of life imprisonment. See, Neb. Rev. Stat. § 28-105 (Cum. Supp. 2002); § 28-707(6). Jim was sentenced to 40 to 50 years' imprisonment.

Jim was 31 years old at the time of the offense, and he has a diploma through the GED program. Jim's criminal history consists primarily of traffic, alcohol, and drug violations, as well as an automobile theft when Jim was younger. Jim's employment was sporadic, and Jim was unemployed at the time of the offense. Jim has a history of substance abuse, both of alcohol and of drugs including marijuana, hashish, barbiturates, methamphetamine, cocaine, LSD, codeine, and Percodan. Further, Jim admitted to injecting methamphetamine during the evening when he was caring for Layne and the offense occurred.

Based upon the nature of the offense and considering Jim's background, including his criminal history and involvement with drugs, we cannot say that the sentence imposed constituted an abuse of discretion. Further, we agree with the district court's assessment that because of the nature of the offense and Jim's prior criminal record, anything less than incarceration would serve to

depreciate the seriousness of the offense in this case and promote disrespect for the law.

## VI. CONCLUSION

Having considered Jim's assignments of error and finding them to be without merit, we affirm Jim's conviction and sentence.

AFFIRMED.