IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF DAMARI J.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF DAMARI J., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

DAMARI J., APPELLANT.

Filed March 1, 2022.    No. A-21-568.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Lawrence G. Whelan, of Whelan Law Office, for appellant.

Nathan Barnhill, Deputy Douglas County Attorney, and Zachary Severson, Senior Certified Law Student, for appellee.

MOORE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

INTRODUCTION

DaMari J. appeals the order of the Douglas County Separate Juvenile Court finding that he was a child within the meaning of Neb. Rev. Stat. § 43-247(2) (Reissue 2016). In connection with the adjudication hearing that led to that order, DaMari contends that the juvenile court erred in finding that the victim's testimony was reliable, credible, probative, and entitled to weight; in finding that the State presented sufficient evidence to support his adjudication beyond a reasonable doubt; in admitting hearsay evidence; and in excluding certain testimony. For the reasons stated herein, we affirm the juvenile court's adjudication order.

- 1 -

## STATEMENT OF FACTS

On October 17, 2020, DaMari gathered at his grandmother's house with his brother, Kameron; his sister, Antonia; and two of his cousins, Kirah and the victim, to make caramel apples. After making caramel apples, the five children, ranging in age from 5 to 15, watched a movie and then fell asleep on various chairs and a mattress on the floor. According to the 10-year-old victim, during the night, DaMari touched her thighs and butt, pulled down her pants, and penetrated her butt with his penis. As a result of these events, in November 2020, the State filed a petition alleging that DaMari was a juvenile as defined by § 43-247(2). The State specifically alleged that DaMari committed the offense of first degree sexual assault when he subjected the 10-year-old victim to sexual penetration without her consent in violation of Neb. Rev. Stat. § 28-319(1)(a) (Reissue 2016). DaMari was born in January 2009, which made him 11 years old at the time of the alleged offense.

The adjudication hearing was held over 2 days in June 2021. The State called the victim; Janet Watson, a Department of Health and Human Services child and family services specialist; the victim's sister, Jada; and the victim's therapist. The State adduced evidence that the victim went to her grandmother's home on October 17, 2020. DaMari, Kameron, Antonia and Kirah were also present. The victim stated that the group made caramel apples around 8 p.m. and then watched a movie. The five children who stayed the night gathered in the TV room where they fell asleep. The victim stated that as she began to fall asleep, DaMari began touching her thighs and her butt. DaMari then got on top of the victim, pulled her pants and underwear down to her thighs, then placed his penis inside of her butt and "rock[ed] back and forth." The victim testified that DaMari ignored the victim's multiple requests to stop. At one point, the victim was able to push DaMari off her and she ran to the bathroom. When the victim returned from the bathroom, DaMari told her not to tell anyone and asked her about a Tik-Tok video. The victim stated that she did not respond to DaMari, but, rather, laid back down on the floor and went back to sleep.

When the victim woke the next morning, she had breakfast with her grandmother, Antonia, and Kirah and got ready for cheerleading practice. Following breakfast, the victim's father drove her to cheerleading practice. The parties dispute whether the victim said "bye" or hugged DaMari as she was leaving. The victim stated that she did not hug or talk to DaMari that morning, but admitted it was possible that she might have said "bye" to him. The witnesses disputed whether the victim hugged DaMari before leaving for cheer practice.

The victim did not disclose the assault to her grandmother, father, coach, teammates, mother, or stepfather that morning. The victim stated that she did not report the assault to her grandmother because she did not think her grandmother would believe her due to the grandmother's close relationship with DaMari. The victim also stated that she was worried that she might not be believed and she did not tell her friends or coaches because she did not want everyone to know what happened to her. The victim did not report the events to her mother or stepfather because she was "scared."

Later that day, the victim went to her mother's home where she resided half of the time with her mother, stepfather, and sister, Jada. Later in the evening, after the victim and Jada went to their shared bedroom, Jada heard the victim tell their mother that the victim's stomach hurt after which the victim entered the bathroom. Jada stated that when the victim returned from the

bathroom, the victim was crying and appeared nervous and scared. In response to Jada's inquiry about what was wrong, Jada stated the victim, while crying and stuttering, told her that DaMari had put his penis inside of her. She told Jada that, although she normally had some tearing due to constipation, the tearing was worse and when she wiped, there was blood. With respect to the timing of the disclosure, the victim testified that she heard her mother and stepfather "doing it in their room" which triggered her own feelings of sadness over what had happened to her. Following the victim's disclosure to Jada, the victim participated in an interview with law enforcement and underwent a forensic interview and a medical exam. The medical exam revealed that the victim had some anal fissures consistent with trauma, but that the examiner was unable to exclude the possibility of trauma from constipation or large stools.

The victim testified regarding her prior interactions with DaMari and described the events that occurred as stated above. On cross-examination, DaMari challenged the truthfulness of the victim's testimony by attempting to point out inconsistencies between her trial testimony and prior statements or omissions in her deposition, to law enforcement, or to the forensic interviewer. Specifically, DaMari first asserted that the victim did not report to law enforcement that she pushed DaMari off by doing a push-up, pulled up her pants, and ran into the bathroom despite testifying at trial to those facts. Second, DaMari alleged that the victim's testimony was not credible because the victim testified in her deposition that she did not say anything to DaMari as she left her grandmother's house in the morning, but at trial stated that she might have said "bye" to him. Third, DaMari asserted that the victim's testimony was discredited due to her being unable to recall that she told the forensic interviewer that DaMari did not touch her anywhere besides her butt, but at trial indicated that he touched her butt and her thighs. Fourth, DaMari stated that the victim was unable to remember that she told the forensic interviewer that she did not look back as she ran to the bathroom, but at trial the victim testified that she did look back but that it was too dark to see DaMari. Fifth, DaMari stated that the victim never told the forensic interviewer that DaMari had said gross things to her, but then at trial, the victim stated that DaMari would talk about "nasty things," "sexual stuff or just . . . nasty stuff like sex," and that she did not really like hanging out with DaMari because he talked about weird things and had made her feel uncomfortable. Sixth, DaMari contended that the victim's testimony was inconsistent because she was unable to recall telling the forensic interviewer that she was in the bathroom for 20 minutes, but then testified at trial that she was only in the bathroom for a minute or a couple of minutes. Seventh, DaMari indicated that the victim's testimony was inconsistent because the victim could not remember telling law enforcement that when DaMari was done assaulting her, he told her at that time not to say anything, and that she failed to inform the officer that DaMari asked about how to make Tik Tok shirts, but she testified at trial that DaMari told her not to say anything after she came back from the bathroom and that when DaMari asked about the Tik Tok shirts, the victim did not respond. Eighth, DaMari stated that the victim's testimony was discredited because the victim did not remember reporting to law enforcement that it was "pretty dark" so she was unsure what DaMari, if anything, had put inside of her, but at trial the victim testified that after DaMari pulled down her pants, he was rocking back and forth and put his penis inside of her.

Jada recounted the statement the victim made to her on the evening following the night of the alleged assault. DaMari posed a hearsay objection which was overruled by the court.

Watson, the DHHS family service specialist, testified that Antonia was interviewed at Project Harmony in December 2020. Watson admitted during cross-examination that during the Project Harmony interview, Antonia did not disclose any inappropriate touching or contact of Antonia by DaMari. Further, Antonia reported "hearing all of her family members thinking that the [victim] was a liar and . . . that she is agreeing with what she has heard from the adult family members."

The victim's therapist testified that she began treating the victim in January 2021 after receiving a referral from Project Harmony and that she sees the victim on a weekly basis to help the victim proceed and heal from trauma.

Following the State's evidence, defense counsel called DaMari's brother, Kameron, and the victim's grandmother. The grandmother stated that on the night of the alleged assault, she slept in her bedroom down the hall but woke up four to five times to check on the children throughout the night and did not hear anything that concerned her. The victim's grandmother further testified that on the morning following the alleged assault, the victim appeared "normal" and "cheery" and did not appear to be angry or mad. The grandmother further indicated that she knows when the victim is upset and that the victim was not upset on this particular morning.

Kameron testified on behalf of the defense as to what occurred the night of the incident. After making caramel apples, Kameron indicated that they went to watch a movie and he subsequently fell asleep on an air mattress. In addition to discussing where he was during the movie, Kameron testified that DaMari was in the black chair closest to the window, the victim and Kirah were on the recliner, and Antonia was on the floor beside the recliner. Kameron testified that he fell asleep first during the movie, but that he woke up for 2 minutes during the night. He stated that he looked around and noticed that Antonia and Kirah were in the recliner, and the victim was sleeping on the rug next to the air mattress where he was sleeping. DaMari was still in the chair. Kameron stated that he went back to sleep fairly quickly after that. Kameron stated that he did not notice anything unusual or that would cause him alarm in the time he looked around. When he woke up the next morning, Kameron stated that the victim was getting ready to leave for cheer practice and she appeared happy and cheerful. Kameron testified that the victim gave "all of us" a hug and said goodbye. Kameron specifically stated that he saw the victim give DaMari a hug. Kameron stated that he did not notice anything unusual about the victim that morning. On cross-examination, Kameron stated that he was the last to wake up in the morning, and did not hear anyone moving around while he was asleep, despite stating he was not a heavy sleeper.

The defense also attempted to call "Antonia [W.] to testify on behalf of DaMari." In response, the State objected to Antonia testifying at trial on the basis that defense counsel failed to disclose the witness on its witness list prior to the court-imposed trial witness deadline. The witness list included an individual named "Antonia [J.]," and DaMari's counsel argued that "Antonia [W.]" and "Antonia [J.]" were the same person and the State was aware that Antonia was one of the individuals in the home during the alleged assault. The court sustained the State's objection and precluded Antonia from testifying finding that the difference between the two names was material. Defense counsel made an offer of proof indicating that the State was aware that Antonia was present on the night of the events and had also completed a forensic interview of Antonia, and offered a video recording of the interview as its offer of proof governing the matters Antonia would

have testified to had she been allowed to testify. The court, in its order, noted the offer of proof, but specifically stated that it did not consider it as evidence when deciding the case.

Following the hearing, the juvenile court adjudicated DaMari based upon its finding that the State had proved, beyond a reasonable doubt, that DaMari had committed the offense of first degree sexual assault. DaMari has timely appealed to this court.

## ASSIGNMENTS OF ERROR

DaMari assigns as error, restated and renumbered, that the district erred in (1) finding that the victim's testimony was reliable, credible, probative, and entitled to weight; (2) finding that the State adduced sufficient evidence, beyond a reasonable doubt, to support adjudication; (3) admitting a hearsay statement of the victim's sister, Jada; and (4) excluding testimony of Antonia W. and failing to consider her testimony as reflected in her forensic interview.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

The admissibility of evidence is reviewed for an abuse of discretion, where the Nebraska Rules of Evidence commit the evidentiary question at issue to the discretion of the trial court. *State v. Jim*, 13 Neb. App. 112, 688 N.W.2d 895 (2004). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020).

When judicial discretion is not a factor involved in assessing admissibility, the court's application of the Nebraska rules of evidence will be upheld, unless clearly erroneous. *State v. Jim, supra*. An appellate court will review for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019); *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014); *State v. Edwards*, 28 Neb. App. 893, 949 N.W.2d 799 (2020).

An appellate court reviews for clear error the trial court's factual findings underpinning the excited utterance hearsay exception, resolving evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

## ANALYSIS

### WITNESS CREDIBILITY

DaMari first argues that the juvenile court erred in finding that the victim's testimony was reliable, credible, probative, and entitled to weight despite inconsistencies in the victim's testimony.

Pursuant to our standard of review, we review this juvenile case de novo on the record and reach our conclusions independently of the findings made by the juvenile court; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Mateo L. et al.*, *supra*.

Here, the victim unequivocally testified at the adjudication hearing that DaMari committed penile/anal penetration without her consent. However, DaMari contends that the victim's testimony was not credible because no one else in the room witnessed the alleged assault and her testimony at trial was inconsistent with prior statements she made concerning the incident. When comparing the victim's versions of events first described to law enforcement and then later at trial, we recognize that there are some discrepancies governing the order, timing, and some details of certain events. But, there were no discrepancies governing the victim's description of DaMari's specific acts which constitute the crime of first degree sexual assault. That is, the victim unequivocally and consistently reported that DaMari sexually penetrated her without her consent on the night of the sleepover. No one at trial refuted the victim's testimony of that act. DaMari had a full and fair opportunity to cross-examine the victim, and the juvenile court had the opportunity to hear and observe the witnesses at trial. Although some minor details governing the victim's versions of what took place the night of the incident were in conflict, this court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re interest of Sloane O.*, 291 Neb. 892, 870 N.W.2d 110 (2015). The juvenile court found that the victim was a credible witness and her testimony was reliable. We rely upon the juvenile court's determination in this regard and find no error in the court's conclusion that the victim was credible. This first assignment of error fails.

SUFFICIENCY OF EVIDENCE

DaMari next argues that the evidence submitted at trial was insufficient to support the district court's determination that DaMari committed the offense of first degree sexual assault beyond a reasonable doubt. DaMari contends that because there was no physical or blood evidence proffered, and because the three other sleeping children in the room did not wake up during the alleged incident, there was simply not enough corroborating evidence to support the victim's allegation that a sexual assault occurred.

The adjudication was based upon § 43-247(2). That statute confers jurisdiction upon the juvenile court if the juvenile committed an act which would constitute a felony under the laws of this state and who was 11 years of age or older at the time the act was committed. DaMari, who was 11 years old at the time of the alleged offense, was charged with first degree sexual assault under § 28-319(1)(a), which is a Class II felony. That charge required the State to prove that DaMari subjected the victim to sexual penetration without her consent. Pursuant to Neb. Rev. Stat. § 43-279 (Reissue 2016), the State was required to prove that allegation beyond a reasonable doubt. DaMari argues that the lack of blood evidence and failure to otherwise corroborate the victim's account renders the evidence insufficient to adjudicate DaMari. We disagree.

The victim unequivocally testified that DaMari sexually penetrated her on the night of the sleepover without her consent. The juvenile court found the victim to be credible, and as we said

before, we give weight to the fact that the juvenile court observed the witnesses and accepted the victim's account over DaMari's suggestion that inconsistencies in certain aspects of the victim's account should defeat it. Although none of the other sleeping children were awakened during the assault and, thus, did not corroborate the victim's testimony, Nebraska law is clear that the State is not required to corroborate a victim's testimony in cases of first degree sexual assault; the victim's testimony alone is sufficient if believed by the fact finder. See, Neb. Rev. Stat. § 29-2028 (Reissue 2016); *State v. Davis*, 277 Neb. 161, 762 N.W.2d 287 (2009). Likewise, the failure to corroborate the victim's claim that she was sexually penetrated with blood evidence was not required to support a conviction. And we note that the victim testified to being cut in her anus and a forensic examination revealed anal fissures consistent with trauma, but the examiner simply could not exclude the possibility that the fissures were caused by constipation or large stools as opposed to the sexual assault.

Following our de novo review of the record, when applying weight to the juvenile court's determination that the victim's testimony was credible, and because corroboration is not required to support the victim's testimony of sexual assault, we cannot say that the evidence was insufficient to support his adjudication. This assigned error fails.

JADA'S TESTIMONY

DaMari next argues that the juvenile court erred when it permitted Jada, the victim's sister, to testify as to the victim's statements about the incident which were made the night after the assault. Specifically, DaMari contends that Jada's testimony regarding the statements made to her by the victim were inadmissible because the statements were hearsay and did not fall within the excited utterance hearsay exception to the hearsay rule.

The Nebraska Evidence Rules control adduction of evidence at an adjudication hearing under the Nebraska Juvenile Code. *In re Interest of Hla H.*, 25 Neb. App. 118, 903 N.W.2d 664 (2017). See, also, § 43-279(1). An appellate court reviews for clear error the trial court's factual findings underpinning the excited utterance hearsay exception, resolving evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *State v. Pullens*, 281 Neb. 828, 800 N.W.2d 202 (2011).

Neb. Rev. Stat. § 27-802 (Reissue 2016) states that "[h]earsay is not admissible except as provided by these rules, by other rules adopted by the statutes of the State of Nebraska, or by the discovery rules of the Supreme Court." "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat. § 27-801(3) (Cum. Supp. 2020). Among the exceptions to the general rule regarding the inadmissibility of a hearsay statement is the excited utterance exception. That exception provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition" is not excluded under the hearsay rule even though the declarant is available as a witness. Neb. Rev. Stat. § 27-803(1) (Reissue 2016). We note that, as of August 28, 2021, the excited utterance exception was relocated to § 27-803(2); however, the adjudication hearing in this case occurred in June 2021 which was prior to the amendment.

As this court stated in *State v. Edwards*, 28 Neb. App. 893, 917-18, 949 N.W.2d 799, 820 (2020):

> For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant under the stress of the event. *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018). The key requirement to the excited utterance exception is spontaneity, which requires a showing that the statements were made without time for conscious reflection. *Id*. An excited utterance does not have to be contemporaneous with the exciting event. *Id*. It may be subsequent to the event if there was not time for the exciting influence to lose its sway. *Id*. The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event. *Id*. Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning. *Id.*

The Nebraska Supreme Court explained in *State v. Castillo-Zamora*, 289 Neb. 382, 393-94, 855 N.W.2d 14, 25 (2014):

> To be excited utterances, statements need not be made contemporaneously with the exciting cause but may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. The true test in spontaneous exclamations is not when the exclamation was made, but whether under all the circumstances of the particular exclamation the speaker may be considered as speaking under the stress of nervous excitement and shock produced by the act at issue. The time between when the event occurs and the statements are made is not "of itself dispositive of the spontaneity issue." The length of time for the exception to apply depends on the facts of the case.

Here, the court found that the victim's statement to her sister concerning the sexual assault satisfied the excited utterance exception.

DaMari assigns error to that ruling arguing that the third element was not present; that is, the victim's statement made to Jada the night after the event was simply too remote in time to be considered to have been made under the stress of the event. Because the issue involves a question of fact, we review whether the juvenile court clearly erred in finding that the victim's statement was made while still under the stress of the event.

Jada testified that at the time the victim told her about the sexual assault, the victim emerged from the bathroom visibly upset, crying, and stuttering. The victim testified that when she overheard her mother and stepfather "doing it in their bedroom" that evening, it triggered feelings of sadness over what DaMari did to her which made her cry. After Jada asked what happened to her, the victim relayed what had happened to her. The question becomes whether the nearly 24-hour delay between the incident and the victim's report was sufficient to render the statement too remote to be considered made by the victim under the stress of the event. We hold that it does not.

A similar argument was made in *State v. Edwards, supra*. In *Edwards*, a child reported to her mother that her "pee-pee" hurt because her "papa put his fingers in there" the evening following the alleged incident. This court stated:

> An excited utterance does not have to be contemporaneous with the exciting event. [*State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018).] It may be subsequent to the event if there was not time for the exciting influence to lose its sway. *Id*. The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event. *Id*.

*State v. Edwards*, 28 Neb. App. at 917, 949 N.W.2d at 820. This court ultimately held:

> Here, although J.E. explained her distress in response to questions from her parents, she initially, without inquiry or prompting, pulled down her underwear and told her mother that her "pee-pee" hurt. Her initial statement was made the same evening after the digital penetration of her vagina by Edwards that afternoon at the swimming pool. Her statement and physical actions reflect the stress of her grandfather having touched her in a painful and unexpected way. The district court did not err in admitting the parents' testimony about J.E.'s statements.

*Id.* at 918, 949 N.W.2d at 820.

We reach a similar conclusion here. Within approximately 24 hours of the incident, the victim emerged from the bathroom crying and exhibiting stress about the incident after being triggered when she overheard her other and stepfather "doing it in their bedroom." It was only in reaction to the manifestation of distress that Jada asked the victim what was bothering her and received the victim's explanation. The victim's statement and physical actions, made within 24 hours of the incident, reflect the stress of the victim's cousin having penetrated her in a shocking and unexpected way, and we cannot say that the court clearly erred in finding that the victim's statement to Jada was made while still under the stress of that event. This assignment fails.

EXCLUSION OF TESTIMONY OF ANTONIA W.

DaMari finally argues that the juvenile court abused its discretion when it refused to allow Antonia W. to testify on the basis that the witness was not disclosed by the discovery deadline.

Prior to trial, the court entered a reciprocal discovery order with the deadline to submit discovery set for 12 p.m. on March 31, 2021. Pursuant to the court's order, both parties submitted their list of witnesses and exhibits. DaMari's witness list included a witness identified as "Antonia [J.]" At trial, DaMari attempted to call witness "Antonia [W.]" to testify about her version of events which occurred on the day of the assault. The State objected based upon DaMari's failure to disclose the witness. DaMari argued that "Antonia [W.]" was the same person as the witness "Antonia [J.]" identified on his exhibit list. The court sustained the State's objection finding that the difference in name was material and that the difference constituted a violation of the court's pretrial order regarding discover. DaMari made an offer of proof arguing that Antonia should be allowed to testify because she was present on the night of the alleged assault and had given a forensic interview. DaMari's counsel argued that, had Antonia been permitted to testify, her

testimony would have been substantially similar to her responses to questions contained in the December 10, 2020, forensic interview conducted at Project Harmony. DaMari contends that because the State was aware that Antonia was present on the night of the alleged assault and had given a forensic interview, the State was not prejudiced by the alleged disclosure violation. The district court sustained the State's objection to Antonia's testimony and excluded Antonia's testimony determining that the difference between the witness' name as identified on DaMari's witness list and the witness' name that they sought to call as a witness at trial was material, despite the two names referring to the same person.

We have reviewed the recording of Antonia's forensic interview which was offered by DaMari to prove what Antonia would have testified to had she been called. In that regard, the substance of Antonia's testimony was similar to testimony provided by her brother Kameron which was that she did not wake up during the night, did not find out what happened until the next day, and that she did not believe that DaMari did anything wrong. Further, during the cross-examination of CFS worker Janet Watson, DaMari's counsel elicited testimony that during Antonia's Project Harmony forensic interview, she denied any inappropriate touching of her by DaMari and "reported hearing all of her family members thinking that the [victim] was a liar and saying she is agreeing with what she has heard from adult family members."

After reviewing the entirety of the forensic interview, we find that the testimony of Antonia would have been cumulative of evidence otherwise already proffered and received during the course of the adjudication hearing. As such, assuming without deciding that the court abused its discretion in not allowing Antonia to testify, we find that there was no prejudice from the juvenile court's refusal to allow her to testify. "An improper exclusion of evidence is ordinarily not prejudicial where substantially similar evidence is admitted without objection." *In re Interest of Tabatha R.*, 255 Neb. 818, 835, 587 N.W.2d 109, 121 (1998). Because there was no prejudice in the juvenile court's refusal to allow Antonia to testify to matters already in the record, the assignment of error fails.

## CONCLUSION

For the reasons stated herein, we affirm the juvenile court's order of adjudication.

AFFIRMED.