Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/06/2020 08:07 AM CDT

State of Nebraska, appellee, v. Robert E.
Edwards, Sr., appellant.
___ N.W.2d___

Filed September 29, 2020.    No. A-19-383.

1. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
2. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
3. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.
4. **Rules of Evidence: Hearsay: Appeal and Error.** Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on hearsay grounds.
5. **Constitutional Law: Motions to Suppress: Confessions: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.

6. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact.

7. **Criminal Law: Evidence: Appeal and Error.** When examining a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

8. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

9. **Trial: Evidence: Appeal and Error.** Because overruling a motion in limine is not a final ruling on admissibility of evidence and, therefore, does not present a question for appellate review, a question concerning admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection to the evidence during trial.

10. **Trial: Appeal and Error.** On appeal, a defendant may not assert a different ground for his or her objection than was offered at trial.

11. **Trial: Waiver: Appeal and Error.** Failure to make a timely objection waives the right to assert prejudicial error on appeal.

12. **Appeal and Error.** An appellate court is not obligated to engage in analysis that is not necessary to adjudicate the case and controversy before it.

13. ____. It is not the function of an appellate court to scour the record looking for unidentified evidentiary errors.

14. **Rules of Evidence: Hearsay.** When an out-of-court statement relates the content of another out-of-court statement, there must be an independent hearsay exception for each statement.

15. ____: ____. Neb. Rev. Stat. § 27-803(3) (Reissue 2016) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment.

16. **Rules of Evidence: Hearsay: Sexual Assault: Minors.** Statements made by a child victim of sexual abuse to a forensic interviewer in the chain of medical care may be admissible under Neb. Rev. Stat. § 27-803(3) (Reissue 2016) even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes.

17. **Rules of Evidence: Hearsay: Police Officers and Sheriffs.** The fundamental inquiry to determine whether statements, made by a declarant

who knew law enforcement was listening, had a medical purpose is if the challenged statement has some value in diagnosis or treatment, because the patient would still have the requisite motive for providing the type of sincere and reliable information that is important to that diagnosis and treatment.

18. **Rules of Evidence: Hearsay: Proof.** Statements having a dual medical and investigatory purpose are admissible under Neb. Rev. Stat. § 27-803(3) (Reissue 2016) only if the proponent of the statements demonstrates that (1) the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional.

19. **Rules of Evidence: Hearsay: Intent.** Under Neb. Rev. Stat. § 27-803(3) (Reissue 2016), the fundamental inquiry when considering a declarant's intent is whether the statement was made in legitimate and reasonable contemplation of medical diagnosis or treatment.

20. \_\_\_\_: \_\_\_\_: \_\_\_\_. Under Neb. Rev. Stat. § 27-803(3) (Reissue 2016), the appropriate state of mind of the declarant may be reasonably inferred from the circumstances; such a determination is necessarily fact specific.

21. **Rules of Evidence: Hearsay.** For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant under the stress of the event.

22. **Rules of Evidence: Hearsay: Proof.** The key requirement to the excited utterance exception is spontaneity, which requires a showing that the statements were made without time for conscious reflection.

23. **Rules of Evidence: Hearsay.** An excited utterance does not have to be contemporaneous with the exciting event. It may be subsequent to the event if there was not time for the exciting influence to lose its sway. The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event.

24. \_\_\_\_: \_\_\_\_. Facts relevant to whether a statement is an excited utterance include the declarant's manifestation of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning.

25. **Courts: Expert Witnesses.** Under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

26. **Trial: Expert Witnesses: Intent.** The purpose of the gatekeeping function is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact.

27. **Trial: Expert Witnesses.** Before admitting expert opinion testimony, the trial court must (1) determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert; (2) if an expert's opinion involves scientific or specialized knowledge, determine whether the reasoning or methodology underlying the testimony is valid; (3) determine whether that reasoning or methodology can be properly applied to the facts in issue; and (4) determine whether the expert evidence and the opinions related thereto are more probative than prejudicial.

28. ____: ____. A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.

29. ____: ____. A trial court, when faced with an objection under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.

30. **Trial: Expert Witnesses: Records: Appeal and Error.** After an objection under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), has been made, the losing party is entitled to know that the trial court has engaged in the heavy cognitive burden of determining whether the challenged testimony was relevant and reliable, as well as a record that allows for meaningful appellate review.

31. **Trial: Expert Witnesses: Appeal and Error.** Without specific findings or discussion on the record, it is impossible to determine whether the trial court carefully and meticulously reviewed the proffered scientific evidence or simply made an off-the-cuff decision to admit expert testimony. The trial court must explain its choices so that the appellate court has an adequate basis to determine whether the analytical path taken by the trial court was within the range of reasonable methods for distinguishing reliable expert testimony from false expertise.

32. **Miranda Rights.** The safeguards provided by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), come into play whenever a person in custody is subjected to either express questioning or its functional equivalent.

33. **Constitutional Law: Miranda Rights.** *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody."

34. **Arrests: Words and Phrases.** Being in custody does not require an arrest, but refers to situations where a reasonable person in the defendant's situation would not have felt free to leave and, thus, would feel the restraint on freedom of movement of the degree associated with a formal arrest.

35. **Miranda Rights: Evidence.** Statements made in a conversation initiated by the accused or spontaneously volunteered by the accused are not the result of interrogation and are admissible.

36. ____: ____. Any statement given freely and voluntarily without compelling influences is admissible in evidence.

37. **Criminal Law: Evidence: New Trial: Appeal and Error.** Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict.

38. **Evidence: New Trial: Double Jeopardy: Appeal and Error.** If evidence is not sufficient to sustain a verdict after an appellate court finds reversible error, then double jeopardy forbids a remand for a new trial.

39. **Appeal and Error.** An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings.

Appeal from the District Court for Custer County: KARIN L. NOAKES, Judge. Reversed and remanded for a new trial.

Brandon J. Dugan for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

MOORE, Chief Judge, and RIEDMANN and WELCH, Judges.

MOORE, Chief Judge.

## I. INTRODUCTION

Robert E. Edwards, Sr., appeals from his conviction and sentence in the district court for Custer County for one count

of first degree sexual assault of a child. The court sentenced him to 25 to 30 years' imprisonment. On appeal, Edwards assigns error to various evidentiary rulings by the court and its denial of his motion to suppress, challenges the sufficiency of the evidence to convict him, and asserts that the court imposed an excessive sentence. We find that the district court erred in fulfilling its gatekeeping function required under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/Schafersman*), with respect to the admission of evidence regarding grooming in child sexual assault cases. Therefore, we reverse the conviction and remand the cause for a new trial.

## II. BACKGROUND

### 1. INCIDENT AND CHARGE

On June 24, 2017, Deputy Sheriff Rachel Davis met with J.E.'s parents regarding an alleged sexual assault of J.E. by her grandfather, Edwards, which took place on June 19. At the time of the alleged assault, J.E. was 4 years old and Edwards was 70 years old. After meeting with J.E.'s parents, Davis scheduled a forensic interview of J.E. for June 27 at the Family Advocacy Network (FAN) in Kearney, Nebraska. During that interview, J.E. said that while she was at the local public swimming pool with Edwards, he put his fingers in her "pee-pee," which she identified as her vaginal area, and that it "very, very hurt." The accompanying medical examination at the FAN revealed internal vaginal injuries consistent with digital penetration. On June 29, when Davis interviewed Edwards at his home, he denied doing anything to J.E. Edwards was subsequently arrested.

On September 19, 2017, the State filed an information in the district court, charging Edwards with first degree sexual assault of a child in violation of Neb. Rev. Stat. § 28-319.01 (Reissue 2016), a Class IB felony. The State alleged that on or about

June 19, Edwards, a person 19 years of age or older, subjected J.E., a person less than 12 years of age, to sexual penetration.

## 2. Motion in Limine

On September 17, 2018, the State filed a motion pursuant to Neb. Rev. Stat. § 27-414 (Reissue 2016) to introduce evidence through the testimony of J.E.'s sister of Edwards' prior bad acts.

On September 19, 2018, Edwards filed a motion in limine, seeking to exclude certain evidence at trial. As relevant to the present appeal, Edwards sought to exclude (1) evidence of "any of the prior bad acts alleged in the State's Motion for 414 evidence," along with any other bad acts evidence pursuant to Neb. Rev. Stat. § 27-404 (Reissue 2016) or § 27-414; (2) hearsay testimony of any and all witnesses as to J.E.'s statements; (3) any testimony by Dr. Susan Greenwald, the doctor who conducted the medical examination of J.E. at the FAN, or any other witness as to the "'grooming' technique as disclosed in [Greenwald's] deposition" for reasons including that it did not meet the standard of *Daubert*/*Schafersman*; and (4) "any expert testimony of any witness or reports thereof not specifically authorized by the Court prior to being offered" (specifically testimony of forensic interviewer Kori Peters as to any "'grooming' technique").

At the hearings on Edwards' motion in limine and the State's motion regarding prior bad acts evidence, the district court heard testimony from witnesses, including J.E.'s mother and sister. The court also received evidence concerning statements made by J.E. and Greenwald's anticipated testimony, including the depositions of J.E., her mother, Greenwald, and Peters and certain statements in the deposition of J.E.'s sister.

With respect to the alleged prior bad acts by Edwards, J.E.'s mother testified regarding two prior incidents, one involving Edwards and J.E.'s cousin and one involving Edwards and herself. The first incident described by J.E.'s mother occurred about 6 or 7 years before the hearing. According to

the mother, Edwards was watching her "playing around" with J.E.'s cousin, who was 17 or 18 years old. After the mother and cousin went into another room and sat on the couch, Edwards followed, said something, and grabbed the cousin's breast. The mother stated that she said to Edwards, "what the hell are you doing," but that he simply turned around and left the room. She acknowledged that while she and the cousin were "playing around," the cousin had "grabbed [the mother's] breast." The mother indicated that the second incident occurred around 2000 or 2001. She stated that she was on her hands and knees cleaning up a spill on the floor when Edwards came up from behind her, held her down on the floor, and would not let her get up.

J.E.'s sister was 23 years old at the time of her testimony about prior incidents involving Edwards, occurring when she lived in Maryland. The sister has various "developmental delays," including being "[b]orderline handicapped," and she has "hearing impairment, memory loss, and seizures." The sister testified that when she was about 7 years old, Edwards would sit in a rocking chair, put her on his lap, and rock her "back and forth." While doing this, he would "put his hand up [her] shirt and he would grab for the breast area, and then after that he would put his hand over down to [her] private area." According to the sister, when she was about that same age, she would be with Edwards in his semi-truck and he would "try to unzip [her] pants." According to the sister, these incidents happened on more than one occasion. The sister testified that during the same period, Edwards regularly and publicly referred to her as his "girlfriend" or "wife"; she indicated that Edwards has referred to J.E. by those terms as well.

According to Greenwald's deposition testimony, she had previously testified as an expert witness in various civil, criminal, and juvenile court proceedings. According to her curriculum vitae, she has been a child forensic examiner since 1986 and an independent contractor for the FAN since 2001. She also had a general pediatric practice from 1986 to 2015.

Greenwald has had formal training on the issue of grooming and has had experience conducting "hundreds" of examinations of molested children in seeing "how their molesters have gained access" to them. Greenwald has not published any works of her own or peer-reviewed articles on the concept of grooming, because she is a clinician and not a researcher.

Greenwald testified about her examination of J.E., which she described as being "abnormal" both due to the redness and swelling in J.E.'s vaginal area and because J.E. was "basically too cooperative." Greenwald testified that 4-year-old children do not normally "just lay down and spread their legs for you," which J.E. did. Greenwald indicated that J.E. "held perfectly still" for the examination, which was also unusual, and that she was "very cooperative, very docile." Greenwald testified that this was significant because in her experience children who have been "coached or groomed" by a sexual molester are much more docile during an examination than children who have not.

Greenwald provided further testimony regarding grooming, which she described as a "clinical term," involving gaining a child's trust through things such as buying them gifts and doing fun activities like playing games with them. She said grooming will often include pornography. She testified that grooming might start by having the child sit on the person's lap "and then just gradually working up to sexual activity." Greenwald indicated that a perpetrator could use such normal activities as a way of "desensitizing the child" to progressively more sexual kinds of touching. She testified that while there are many ways to groom a child, they all involve gaining the child's trust and "basically teaching them to be sexual creatures." According to Greenwald, grooming is "very common" in child abuse cases and is usually done by someone the child trusts, such as a family member or someone close to the family. Greenwald has seen perpetrators who engage in grooming "switch victims."

Greenwald testified that in her experience, she felt that J.E. was exhibiting behaviors of someone who had been groomed. She was not asked and did not provide any testimony as to whether any particular actions by Edwards constituted grooming.

In Peters' deposition, she testified about her forensic interview of J.E. at the FAN on June 27, 2017. She did not testify regarding grooming.

The district court subsequently entered orders ruling on the State's motion to admit evidence of prior bad acts and Edwards' motion in limine. With respect to the evidence of the alleged prior incidents involving J.E.'s cousin and sister, the court found clear and convincing evidence that Edwards committed sexual offenses against them and determined that the evidence was admissible under § 27-414. As to J.E.'s statements, the court assumed Edwards was objecting to statements made by J.E. to her parents regarding the alleged sexual assault. The court denied Edwards' motion with respect to those statements, finding that the circumstances surrounding them satisfied the excited utterance exception to the hearsay rule. Finally, the court determined that the "combination of Dr. Greenwald's education, experience, and training in the area of child sexual abuse was sufficient to admit her testimony regarding grooming patterns and behavior." The court stated that such testimony "is useful for the jury to evaluate the credibility of the witness and is evidence of motive and intent." The court denied Edwards' motion with respect to Greenwald's anticipated testimony about "grooming." In contrast, the court determined that while Peters' experience and training "may qualify her as an expert regarding grooming patterns and behaviors of child molesters," the court had not been presented with any testimony in her deposition regarding "grooming behavior." Accordingly, the court granted Edwards' motion with respect to Peters and ordered that the State was not allowed to argue or offer evidence on any opinion Peters may have on "grooming patterns and techniques."

### 3. Motion to Suppress

On September 19, 2018, Edwards filed a motion to suppress his statements, alleging that they were taken in violation of his constitutional rights.

At the hearing on Edwards' motion to suppress, the district court heard testimony from Davis about her contact with Edwards on June 24, 2017, first at his residence and later the same day at the residence of J.E.'s parents, and received into evidence a body camera recording of "what happened that day." Davis did not advise Edwards of his *Miranda* rights or place him under arrest during either contact. In ruling on the suppression motion, the court found that the statements made by Edwards in the presence of Davis were not made during a custodial interrogation. Accordingly, the court denied his motion to suppress.

### 4. Trial

A jury trial was held on February 11 through 13, 2019. We have summarized the relevant evidence as follows:

On Monday, June 19, 2017, Edwards picked J.E. up from her parents' house to take her to the swimming pool around 12 p.m., arriving at the pool shortly before 1 p.m., and he brought her home a little after 4 p.m. The evidence reflects that Edwards watched J.E. from a poolside chair, and several witnesses who observed Edwards at the pool that day testified that he did not get in the water with J.E. There were four lifeguards on duty at the pool that afternoon, who rotated positions every 15 minutes between three outside observation chairs and the pool office, and there was a 15-minute break from swimming every hour. The only people allowed to swim in the main pool during the break periods were those over 18 years old; individuals 6 years and younger could be in the "baby pool" area during breaks if they were supervised. The lifeguards each testified to seeing Edwards and J.E. at the pool that day. Three of the lifeguards testified that they never observed any concerning interactions between Edwards and J.E. that day, although their testimony shows that it is not possible to see

the baby pool area from one of the three outside observation chairs or from inside the pool office. The fourth lifeguard testified that Edwards and J.E. were never out of her field of vision that day, clarifying that she had "the main swimming area" in her full view the entire time she was at the pool. She thought she had walked around "during break," but she did not recall whether Edwards and J.E. were in the baby pool area. She was not asked if she observed any concerning interactions between them, and she acknowledged that from one of the lifeguard observation chairs, a person can see who enters and exits the baby pool area but not anything that happens in the baby pool area itself.

J.E.'s sister walked by the swimming pool that afternoon on her way home from work. She testified that she saw J.E. "run out of [the] women's bathroom just bawling" and then saw Edwards "just cussing away." The sister did not "go over there," but she and Edwards waved at one another.

In the hours after Edwards brought J.E. home, her mother gave her a bath and prepared supper, and after supper, J.E.'s mother got J.E. ready for bed. J.E.'s bedtime routine included speaking to her father, an over-the-road truckdriver, by telephone. That evening, while the mother was calling the father, J.E. started pulling down her underwear and told her mother that her "pee-pee" hurt, and when the mother asked why, J.E. said that it was because "papa put his fingers in there." "[P]apa" was J.E.'s name for Edwards. J.E. repeated her allegation when speaking to her father on the telephone.

J.E.'s parents discussed what to do about her disclosure, and because the mother suffered from severe anxiety, they decided to wait until the father returned to address the situation. J.E.'s father returned home late Friday night of that week, and J.E.'s parents contacted law enforcement the following day. This contact resulted in the forensic interview and medical examination of J.E., as well as the police contact with Edwards discussed above.

Peters testified regarding her forensic interview of J.E. at the FAN on June 27, 2017. First, Peters explained how

forensic interviews are conducted and her role in the interview process. Next, Peters testified about J.E.'s responses during the forensic interview, and a video recording of the interview was received into evidence and played for the jury. During the interview, J.E. told Peters that "papa" put his fingers in her "pee-pee," which J.E. identified as her vaginal area, and that it "very, very hurt." J.E. also reported that Edwards rubbed her "boobies" and her "butt." J.E. reported that Edwards did this in the water at the pool and that no one else saw what happened. J.E.'s own trial testimony differed from the forensic interview; at trial, she testified that Edwards touched her under her swimsuit on the outside of her private part and that it happened while she was out of the water.

Greenwald testified about her physical examination of J.E. and about the concept of grooming. Her testimony at trial about her qualifications and about the concept of grooming was similar to her deposition testimony admitted at the motion in limine hearing. During Greenwald's examination of J.E., which occurred on the same day that J.E. was interviewed by Peters, Greenwald observed internal injuries to J.E.'s vaginal area. Greenwald testified that the injuries she observed were consistent with digital penetration. She was asked about "straddle injuries" from something like falling on a bike, and she testified that with such an accident, "if there is any damage to the inner structures, you'd see a lot of damage to the outer structures first." Greenwald did not observe any such outer injuries during her examination of J.E. During the examination, when Greenwald told J.E. that she was going to take pictures of J.E.'s "pee-pee," J.E. "just jumped up on the table and spread her legs and laid down very calmly and was ready." Greenwald testified that that behavior "really caught [her] attention because it's so unusual." According to Greenwald, "that kind of behavior is the result of being trained or groomed." Greenwald then testified further about "grooming," which she described during this portion of her testimony as "a very commonly seen method that sexual offenders will use to gain the cooperation of children."

Davis testified regarding her investigation, including her interview with Edwards at his residence and her subsequent interaction with Edwards at the residence of J.E.'s parents. Video recordings from Davis' body camera showing the interview of Edwards and a portion of the interaction at the parents' residence were received into evidence and played for the jury. During both encounters, Edwards denied touching J.E. inappropriately. During the interview at his residence, he also volunteered information about the incident with J.E.'s sister and denied any wrongdoing in that regard. Davis testified that Edwards was not under arrest during the interview at his residence, and a review of the video shows that he subsequently left the parents' residence without being placed under arrest.

Both J.E.'s mother and J.E.'s sister testified regarding some of the prior incidents with Edwards discussed above. Specifically, J.E.'s mother testified regarding the incident involving J.E.'s cousin and Edwards, and J.E.'s sister testified regarding the various incidents involving her and Edwards. The sister also testified about Edwards calling both her and J.E. his girlfriend and his wife. The incident between Edwards and J.E.'s mother was not referenced at trial.

Finally, Edwards testified in his own behalf. Edwards testified that he would spend time with J.E. and that he took her to places like the pool and park. He testified that he "spoiled" J.E., which he indicated included buying her food treats or toys if she wanted them. Edwards denied doing anything inappropriate to J.E. He acknowledged that on June 19, 2017, he took J.E. to the swimming pool and she went into "the kiddie pool" once, but he denied having gotten into the water himself while they were at the pool. He testified that there was a water fountain in the park but not in the "pool area," and he denied having taken J.E. to the water fountain. Later, he testified that he did not remember a water fountain in the pool area. He stated that he did take J.E. to the bathroom while they were at the pool, but he denied going into the bathroom with her. Edwards disputed the prior incidents testified to by

J.E.'s mother and her sister, which involved Edwards and the sister and Edwards and the cousin.

## 5. Verdict and Sentence

The jury found Edwards guilty of first degree sexual assault of a child, and the district court accepted the jury's verdict. The court subsequently sentenced Edwards to 25 to 30 years' imprisonment.

## III. ASSIGNMENTS OF ERROR

Edwards asserts that (1) the district court erred in denying his motion in limine, in granting the State's motion to offer evidence of prior bad acts, and in allowing the testimony of prior bad acts, hearsay statements of J.E., and the testimony of Greenwald; (2) the court erred in denying his motion to suppress; (3) he was prejudiced by the introduction of impermissible evidence; and (4) the court abused its discretion by imposing an excessive sentence.

## IV. STANDARD OF REVIEW

[1-3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.* An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Iddings*, 304 Neb. 759, 936 N.W.2d 747 (2020).

[4] Apart from rulings under the residual hearsay exception, an appellate court reviews for clear error the factual findings underpinning a trial court's hearsay ruling and reviews de novo the court's ultimate determination whether the court admitted evidence over a hearsay objection or excluded evidence on

hearsay grounds. *State v. Dady*, 304 Neb. 649, 936 N.W.2d 486 (2019).

[5] In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. *State v. Montoya*, 304 Neb. 96, 933 N.W.2d 558 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error. *Id.* Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *Id.*

[6,7] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Dady, supra*. When examining a sufficiency of the evidence claim, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

[8] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Iddings, supra*.

## V. ANALYSIS

### 1. MOTION IN LIMINE

Edwards asserts that the district court erred in denying his motion in limine and granting the State's motion to offer evidence of prior bad acts. He argues that the court erred in admitting into evidence testimony about certain prior incidents involving Edwards, J.E.'s hearsay statements to various individuals, and Greenwald's testimony about "grooming."

### (a) Evidence of Prior Bad Acts

Edwards argues that evidence of prior bad acts against the sister, the cousin, and the mother should have been excluded from evidence at trial, pursuant to § 27-414 (governing admission of evidence of defendant's commission of other offenses of sexual assault in criminal cases where defendant is accused of sexual assault). In its order ruling on the portion of Edwards' motion in limine that sought to exclude § 27-414 evidence and the State's motion seeking to introduce such evidence, the district court found clear and convincing evidence that Edwards had committed sexual offenses against J.E.'s cousin and sister. The court stated that it had considered the probability that the offenses had occurred and the similarity of the acts to the crime charged to determine that the probative value of the evidence substantially outweighed the dangers of unfair prejudice. Accordingly, the court found the evidence of prior bad acts of Edwards against the cousin and the sister was admissible at trial.

### (i) Incidents With J.E.'s Sister

There was evidence admitted at trial about the incidents between Edwards and J.E.'s sister. When asked if Edwards ever did "anything" to her when she was younger, the sister responded affirmatively and indicated that this happened in Maryland. When she was asked how old she was at the time, Edwards objected on the bases of relevance, speculation, and hearsay; he also asked for "a running objection." The district court overruled these objections. The sister proceeded to testify that when she was 7 or 8 years old, Edwards would put her on his lap in the rocking chair, rock her back and forth, and then reach under her shirt toward her breast area. She clarified that by saying "reach toward [her] breast area underneath [her] shirt," she meant "like putting your hands and pulling the shirt up and reaching toward the breast area of the boobs and grabbing it." She stated that Edwards did this to her on more than one occasion. She also indicated that when Edwards did this, he "said that he didn't think that girls at [her] age would

have boobs." The sister testified further that Edwards also touched her "[i]n the semi-truck," again in Maryland, and that he would try to unzip her pants. Finally, the sister testified that when she was younger, Edwards would call her "his girlfriend" and "his wife," say that "[she] had a nice body," and tell her that he was going to marry her and that no one else was allowed to marry her. She testified that when Edwards was doing these things to her, it felt "[v]ery uncomfortable and completely wrong."

J.E.'s mother was also questioned about the incidents involving Edwards and the sister. She responded affirmatively when asked if she remembered an incident with Edwards and the sister in Maryland. When asked to tell "a little bit about that," she replied, "She was like seven or eight years and she was starting to get breasts and everything . . . ." At that point, Edwards' attorney objected on the bases of relevancy and "improper impeachment" and asked "that that part be stricken." Following an off-the-record sidebar, the district court overruled Edwards' objections. The mother was asked about the incident again, and the court sustained "leading" and "hearsay" objections to various questions. The mother then testified that she never observed anything that happened. She also recalled that Edwards referred to the sister as "his girlfriend" and that sometimes he would say "hot stuff."

[9,10] The State asserts that Edwards' arguments about the incidents involving the sister are not properly before us because Edwards "did not object on § 27-414 grounds or otherwise renew his motion in limine." Brief for appellee at 16. Because overruling a motion in limine is not a final ruling on admissibility of evidence and, therefore, does not present a question for appellate review, a question concerning admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection to the evidence during trial. *State v. Wood*, 296 Neb. 738, 895 N.W.2d 701 (2017). In his reply brief, Edwards asserts that to the extent he did not mention § 27-414, the nature of his objection "was apparent by the context." Reply brief for

appellant at 9. We disagree. In his objections to the sister's testimony about the incidents with her and Edwards, he neither referenced his motion in limine nor § 27-414. He objected to the sister's testimony on the grounds of relevance, speculation, and hearsay. He does not argue on appeal that his objections on those grounds were improperly overruled. Edwards failed to preserve for appellate review his argument that the district court erred in failing to grant his motion in limine with respect to the sister's testimony about these incidents, and on appeal, a defendant may not assert a different ground for his or her objection than was offered at trial. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). As to the mother's testimony, she did not actually testify about the rocking and touching incidents, and Edwards does not otherwise argue that the mother's testimony referenced above was improperly admitted.

### (ii) Incident With Victim's Cousin

As noted above, Edwards objected at trial when the sister was asked about incidents involving Edwards and herself, and he sought a continuing objection with respect to that testimony. However, J.E.'s sister was also asked if she remembered an incident between Edwards and the cousin, and she testified, without objection, to an occasion when J.E.'s mother and cousin "were horse playing around" and "throwing a pillow back and forth," and Edwards "got up from the chair and went toward [the] cousin . . . and tried to kiss her and grabbed her boob." J.E.'s sister, who was 23 years old at the time of her testimony, stated that this occurred when she was a teenager.

During the mother's testimony, when she was asked about what she observed to have happened between Edwards and the cousin, Edwards objected on the bases of hearsay, improper impeachment, and relevance. The court overruled these objections. The mother then testified, without further objection by Edwards, that she and the cousin were "playing around"; that the cousin "grabbed [the mother's] boob"; and that after

they ran into another room, Edwards followed them, said something, and "grabbed [the cousin's] boob." The mother was questioned further about Edwards' proximity to them during the initial horseplay and lack of involvement in that activity, as well as his proximity to them after they went into another room. Then she again testified, without objection, that Edwards came into the room where they were sitting, said something, and "grabbed [the cousin's] boob." The mother testified that she said to Edwards, "[w]hat the hell are you doing," but that he laughed and walked out without further response.

[11] The State again asserts that Edwards failed to preserve his arguments for appellate review because he did not object on the basis of § 27-414 or otherwise renew his motion in limine. Regardless of whether Edwards' objections at trial to the mother's testimony about the incident involving the cousin were sufficient to preserve the issues raised in his motion in limine, he has waived any prejudicial error. As noted, J.E.'s sister testified at trial without objection to the incident between Edwards and the cousin. Failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Swindle, supra*. And, while Edwards objected at the start of the mother's testimony about this incident, he did not ask for a continuing objection (something he did at other points during trial), and the mother subsequently stated twice, without objection, that Edwards "grabbed [the cousin's] boob."

### (iii) Incident With Victim's Mother

[12] While evidence about an incident between Edwards and J.E.'s mother was introduced at the hearing on Edwards' motion in limine, such evidence was not introduced at trial. Accordingly, we need not further address Edwards' arguments about this particular incident. An appellate court is not obligated to engage in analysis that is not necessary to adjudicate the case and controversy before it. *State v. Lillard*, 27 Neb. App. 824, 937 N.W.2d 1 (2019).

(b) Hearsay Statements of J.E.

[13] In presenting arguments about this portion of his assignment of error, Edwards reviews various hearsay statements in the depositions of J.E.'s mother, Peters, and Greenwald, but those depositions were not offered as evidence at trial. He does cite to certain portions of trial testimony, and we have limited our review of his hearsay arguments to those areas of the trial record cited in Edwards' brief, as it is not the function of an appellate court to scour the record looking for unidentified evidentiary errors. *Smith v. Colorado Organ Recovery Sys.*, 269 Neb. 578, 694 N.W.2d 610 (2005). To the extent that Edwards objected to the cited testimony on the grounds of hearsay, he has preserved his arguments with respect to the motion in limine.

*(i) Testimony of Greenwald*

Edwards objected on the basis of hearsay to Greenwald's testimony that J.E. was brought to the FAN because of J.E.'s statement to her father that "her pee-pee hurt." After the State argued that the testimony should be allowed because it was "part of medical diagnosis," the district court overruled Edwards' objection. Greenwald again testified that J.E. was brought to the FAN because she said "her pee-pee hurt." Greenwald explained further that the interviewer (Peters) told Greenwald that "pee-pee" was J.E.'s word for vagina and that J.E. had told the interviewer that "her pee-pee" had been touched and that it "hurt badly." Greenwald concluded her response by stating that this was "why we did the exam." Greenwald testified without objection that she was told "they were looking for trauma that might have been caused by a digital penetration." Edwards objected on bases including hearsay to the offer of Greenwald's report of her examination of J.E., and the district court sustained the objections. During the State's redirect examination of Greenwald, she affirmed without objection that she had received information "from the interview" that J.E.'s grandfather "had stuck his fingers in [J.E.'s] pee-pee," which was J.E.'s term for her vagina.

[14] "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Neb. Rev. Stat § 27-801(3) (Reissue 2016). Hearsay is not admissible at trial except as provided by the Nebraska Evidence Rules. See Neb. Rev. Stat. § 27-802 (Reissue 2016). "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Neb. Rev. Stat. § 27-805 (Reissue 2016). When an out-of-court statement relates the content of another out-of-court statement, there must be an independent hearsay exception for each statement. *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

As discussed below, J.E.'s statements to her father are admissible under the excited utterance exception. Thus, the first step of the double hearsay requirement is met with respect to those statements. We conclude that it is also met with respect to J.E.'s statements to Peters, which are admissible under the medical diagnosis or treatment exception. Additionally, we conclude that Peters' statements to Greenwald were admissible under the medical diagnosis or treatment exception, and thus, the district court did not err in admitting the portion of Greenwald's trial testimony complained of by Edwards in his brief.

[15] Neb. Rev. Stat. § 27-803(3) (Reissue 2016) provides that the hearsay rule does not exclude "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Section 27-803(3) is based on the notion that a person seeking medical attention will give a truthful account of the history and current status of his or her condition in order to ensure proper treatment. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

[16-18] Statements made by a child victim of sexual abuse to a forensic interviewer in the chain of medical care may be

admissible under § 27-803(3) even though the interview has the partial purpose of assisting law enforcement's investigation of the crimes. *State v. Jedlicka, supra*. The fundamental inquiry to determine whether statements, made by a declarant who knew law enforcement was listening, had a medical purpose is if the challenged statement has some value in diagnosis or treatment, because the patient would still have the requisite motive for providing the type of sincere and reliable information that is important to that diagnosis and treatment. *Id.* However, statements having a dual medical and investigatory purpose are admissible under § 27-803(3) only if the proponent of the statements demonstrates that (1) the declarant's purpose in making the statements was to assist in the provision of medical diagnosis or treatment and (2) the statements were of a nature reasonably pertinent to medical diagnosis or treatment by a medical professional. *State v. Jedlicka, supra*.

[19,20] Under § 27-803(3), the fundamental inquiry when considering a declarant's intent is whether the statement was made in legitimate and reasonable contemplation of medical diagnosis or treatment. *State v. Jedlicka, supra*. Under § 27-803(3), the appropriate state of mind of the declarant may be reasonably inferred from the circumstances; such a determination is necessarily fact specific. *State v. Jedlicka, supra*.

With respect to the scope of this hearsay exception, the Nebraska Supreme Court has stated:

> Although the heart of this exception lies in statements made by a patient to a treating physician, the exception casts its net wider than the patient-physician relationship. Under the federal and Nebraska rules of evidence, statements admissible under the medical diagnosis and treatment exception are not restricted to statements made by the patient and the statements need not be made to a physician. . . . As a general rule, the exception applies to persons seeking medical assistance from persons who are expected to provide some form of health care. . . . Thus, "[t]he declarant need not be the patient—need not

be the person who is experiencing the symptoms to be diagnosed or treated. In other words, the statement need not refer to the declarant's own symptoms."

*In re Interest of B.R. et al.*, 270 Neb. 685, 691, 708 N.W.2d 586, 591 (2005) (citations omitted) (statements by child's foster mother to therapist, reporting unusual sexual behavior by child and her suspicions of sexual abuse, were admissible under § 27-803(3)). See, also, *State v. Huntington*, 216 Wis. 2d 671, 575 N.W.2d 268 (1998) (statements made to nurse practitioner by victim's mother regarding allegations that defendant sexually abused victim were admissible, over double hearsay objection, under medical treatment exception to hearsay rule).

In this case, Peters testified that her forensic interviews are used in conjunction with Greenwald's medical examinations of potential child sexual abuse victims. Peters' interview with J.E. was not scheduled until several days after Peters was initially contacted by law enforcement so that the interview could be conducted on a date when Greenwald was also available to allow for "a fuller picture of what's going on." Greenwald's testimony shows that her medical examination of J.E.'s vaginal area was due to a concern of sexual trauma, and she indicated that it is important to perform a complete examination to determine whether a medical diagnosis could be found. Peters' interview elicited information that was reasonably pertinent to Greenwald's examination of J.E. and the need for any further diagnosis and treatment of her. Peters subsequently relayed this pertinent information to Greenwald in the chain of medical care. Based on our review of the record, the district court did not err in finding that J.E.'s statements, as relayed to Greenwald by Peters and testified to by Greenwald, were admissible under the medical treatment exception to the rule against hearsay.

### (ii) Testimony of J.E.'s Parents

The district court overruled Edwards' hearsay objection when J.E.'s mother testified at trial that on the evening of June 19, 2017, J.E. started pulling down her underwear and

said "my pee-pee hurts." After the court overruled the objection, the mother testified that she asked J.E. "why," and J.E. responded that "papa put his fingers in there." The mother testified further, without objection, that J.E. told her because "papa put his fingers in there" and that J.E. told her father, who was on the telephone with them at the time, "the same thing that she told me." Edwards also references his objections to the testimony of J.E.'s father. The court overruled Edwards' hearsay objection when J.E.'s father started to testify at trial about what J.E. told him on the telephone on the evening in question. The father then testified that she told him her "pee-pee" hurt because Edwards "had put his fingers in there" and that Edwards had said to her "ha ha I got my fingers in there."

[21-24] In ruling on Edwards' motion in limine, the district determined that J.E.'s statements to her parents were admissible as excited utterances. Section 27-803(1) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule. For a statement to qualify as an excited utterance, the following criteria must be established: (1) There must have been a startling event, (2) the statement must relate to the event, and (3) the statement must have been made by the declarant under the stress of the event. *State v. Nolt*, 298 Neb. 910, 906 N.W.2d 309 (2018). The key requirement to the excited utterance exception is spontaneity, which requires a showing that the statements were made without time for conscious reflection. *Id.* An excited utterance does not have to be contemporaneous with the exciting event. *Id.* It may be subsequent to the event if there was not time for the exciting influence to lose its sway. *Id.* The true test is not when the exclamation was made but whether, under all the circumstances, the declarant was still speaking under the stress of nervous excitement and shock caused by the event. *Id.* Facts relevant to whether a statement is an excited utterance include the declarant's manifestation

of stress, the declarant's physical condition, and whether the declarant spoke in response to questioning. *Id.*

Here, although J.E. explained her distress in response to questions from her parents, she initially, without inquiry or prompting, pulled down her underwear and told her mother that her "pee-pee" hurt. Her initial statement was made the same evening after the digital penetration of her vagina by Edwards that afternoon at the swimming pool. Her statement and physical actions reflect the stress of her grandfather having touched her in a painful and unexpected way. The district court did not err in admitting the parents' testimony about J.E.'s statements.

### (c) Testimony of Greenwald About Grooming

In his motion in limine, Edwards sought to exclude testimony by Greenwald about "'grooming'" technique, arguing that it did not meet the standard of *Daubert/Schafersman*. The district court, while not explicitly addressing *Daubert/Schafersman*, ruled that Greenwald was qualified to testify about grooming and that her testimony would be useful to the jury.

At trial, Greenwald was allowed to testify over Edwards' foundational objection that J.E.'s behavior in positioning herself on the examination table indicated to Greenwald that "the child had most likely been trained, or what we call groomed." Greenwald then testified further about "grooming" in general, and Edwards objected on the bases of speculation, foundation, and *Daubert/Schafersman* to this testimony. The court overruled Edwards' objections but gave him a continuing objection to this line of questioning.

[25,26] On appeal, Edwards argues that he was prejudiced by Greenwald's testimony about grooming and that it should have been excluded under *Daubert/Schafersman*. Under the *Daubert/Schafersman* framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *State v. Simmer*, 304 Neb. 369, 935 N.W.2d 167 (2019). The purpose of the gatekeeping function

is to ensure that the courtroom door remains closed to "junk science" that might unduly influence the jury, while admitting reliable expert testimony that will assist the trier of fact. *Id.*

The parties do not cite to any reported Nebraska cases, nor have we found any, that specifically address the admissibility of expert testimony regarding the theory of grooming in child sexual assault cases under a *Daubert/Schafersman* inquiry. However, our statutes and case law regarding the admissibility of expert opinion testimony are instructive.

[27,28] Neb. Rev. Stat. § 27-702 (Reissue 2016) provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Before admitting expert opinion testimony, the trial court must (1) determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert; (2) if an expert's opinion involves scientific or specialized knowledge, determine whether the reasoning or methodology underlying the testimony is valid; (3) determine whether that reasoning or methodology can be properly applied to the facts in issue; and (4) determine whether the expert evidence and the opinions related thereto are more probative than prejudicial. *Gonzales v. Nebraska Pediatric Practice*, 26 Neb. App. 764, 923 N.W.2d 445 (2019). A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community. *State v. Simmer, supra.*

[29-31] A trial court, when faced with a *Daubert/Schafersman* objection, must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper.

*Gonzales v. Nebraska Pediatric Practice, supra*. After such a *Daubert/Schafersman* objection has been made, the losing party is entitled to know that the trial court has engaged in the heavy cognitive burden of determining whether the challenged testimony was relevant and reliable, as well as a record that allows for meaningful appellate review. *Gonzales v. Nebraska Pediatric Practice, supra*. Without specific findings or discussion on the record, it is impossible to determine whether the trial court carefully and meticulously reviewed the proffered scientific evidence or simply made an off-the-cuff decision to admit expert testimony. *Id*. The trial court must explain its choices so that the appellate court has an adequate basis to determine whether the analytical path taken by the trial court was within the range of reasonable methods for distinguishing reliable expert testimony from false expertise. *Id*.

In his motion in limine, Edwards asked the district court to prohibit any testimony by Greenwald (or any other witness) as to the concept of grooming. Edwards asserted that the theory did not meet the standard of *Daubert/Schafersman* for reasons including that it could not be tested "as it is backward looking," did not appear to be peer reviewed, did not appear to have a known rate of error, and was not generally accepted within the scientific community. He further asserted that the theory was not relevant and that any evidence referring to it would be prejudicial. In sum, Edwards was challenging the validity and reliability of any evidence about the grooming process, as well as its relevance.

In ruling on that portion of Edwards' motion in limine, the district court concluded that Greenwald was qualified as an expert in the area of child sexual abuse and her testimony regarding "grooming patterns and behavior" was relevant. However, the court did not address the validity and reliability of the concept of grooming as a process whereby perpetrators acclimate children to sexual activity. We conclude that the district court failed to fulfill its gatekeeping function under *Daubert/Schafersman*.

We further conclude that the court's admission of Greenwald's testimony regarding grooming, without performing the gatekeeping function, was prejudicial error. See *State v. Henley*, 363 Or. 284, 422 P.3d 217 (2018) (admission of forensic interviewer's testimony about grooming without first determining its validity and reliability was prejudicial error; appellate court declined to address scientific validity of such evidence for first time on appeal).

## 2. Motion to Suppress

Edwards asserts that the district court erred in denying his motion to suppress. He argues that statements he made to Davis when she spoke with him at his residence and then at the residence of J.E.'s parents should be suppressed because Davis subjected him to custodial interrogation without advising him of his *Miranda* rights.

[32-36] The safeguards provided by *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Landis*, 281 Neb. 139, 794 N.W.2d 151 (2011). *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." *State v. Schriner*, 303 Neb. 476, 929 N.W.2d 514 (2019). Being in custody does not require an arrest, but refers to situations where a reasonable person in the defendant's situation would not have felt free to leave and, thus, would feel the restraint on freedom of movement of the degree associated with a formal arrest. *Id.* But, statements made in a conversation initiated by the accused or spontaneously volunteered by the accused are not the result of interrogation and are admissible. *Id.* Any statement given freely and voluntarily without compelling influences is admissible in evidence. See *id.*

We find that Edwards was not in custody for the purposes of *Miranda* and the Fifth Amendment at any point prior to his formal arrest, which was subsequent to the conversations

with Davis at issue here. Based on the evidence, including the video recordings from Davis' body camera of both encounters, Edwards freely volunteered various statements during his interactions with Davis on June 24, 2017, as to his interactions with J.E. and about prior allegations concerning him and J.E.'s sister. Davis' initial interview of Edwards occurred at his residence. He was not restrained during the encounter and moved freely about the residence to retrieve his cell phone and cigarettes at various points. The interview was conducted in a conversational tone, and Davis left without arresting Edwards. After leaving Edwards' residence, Davis went to the residence of J.E.'s parents where Edwards showed up without invitation. While there, he voluntarily denied "touch[ing]" J.E. Edwards was asked to leave and eventually did so, again without being placed under arrest. The video recordings from Davis' body camera, which were received into evidence, support a conclusion that Edwards was not in custody at the time of either encounter.

Because Edwards was not in custody, *Miranda* did not apply, and the district court did not err in denying Edwards' motion to suppress.

### 3. Double Jeopardy and Remaining Assignments of Error

[37,38] Having found reversible error in Edwards' assertions with respect to the grooming issue, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Edwards' conviction. Upon finding reversible error in a criminal trial, an appellate court must determine whether the total evidence admitted by the district court, erroneously or not, was sufficient to sustain a guilty verdict. *State v. Draper*, 289 Neb. 777, 857 N.W.2d 334 (2015). If evidence is not sufficient to sustain a verdict after an appellate court finds reversible error, then double jeopardy forbids a remand for a new trial. *Id.* After reviewing the record, we find that the evidence presented at trial, including

the erroneously admitted evidence, was sufficient to support Edwards' conviction. Accordingly, we conclude that double jeopardy does not preclude a new trial.

[39] Because we must reverse and remand for a new trial, we are not required to consider Edwards' additional assignments of error. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019), *cert. denied* ___ U.S. ___, 140 S. Ct. 545, 205 L. Ed. 2d 345. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *State v. Mann*, 302 Neb. 804, 925 N.W.2d 324 (2019). We have addressed Edwards' other assertions regarding evidentiary issues and his motion to suppress above as those issues are likely to recur on remand. However, we need not reach his assigned error regarding sentencing, as this issue must be evaluated in the context of a particular trial.

## VI. CONCLUSION

We conclude that the district court's failure to fulfill its gatekeeping function with regard to the *Daubert*/*Schafersman* challenge to the evidence regarding grooming was prejudicial error. As a result, we reverse Edwards' conviction and remand the cause to the district court for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.